## CIRCUIT COURT OF ARLINGTON COUNTY

Alexandria Park Assn., Inc., etc.

v.

County Board of Arlington et al.

November 15, 1977

. Case No. (Law) 18394

By JUDGE CHARLES S. RUSSELL

After a careful review of the evidence in this case, the authorities cited and the arguments of counsel, I have come to the conclusion that the real estate assessments for the three years in question, 1973, 1974 and 1975, should be substantially reduced.

The Columbia Gardens Cemetery now contains 39.39 acres. It has been in operation since about 1917, pursuant to special permits issued by the former Board of Supervisors, and cemetery lots have been sold continuously since that time. Beginning in 1926, according to the evidence, eight percent of the purchase price of each lot was voluntarily set aside by the management into a "perpetual care fund." Legislation was enacted in 1964 (Code Sec. 57-35.1, *et seq.*) which now requires all cemeteries which advertise "perpetual care" to set aside ten percent of the proceeds of lot sales in trust for this purpose. The perpetual care fund for Columbia Gardens, while substantial, has not yet grown to sufficient size to provide, through its interest alone, for the maintenance of all of the cemetery. Maintenance costs must now be defrayed, in substantial part, by the proceeds of the sales of lots, markers, urns and interment services. It is expected that when the cemetery is fully "sold out" the interest from the perpetual care fund will defray all maintenance costs in perpetuity.

About twenty acres of the cemetery area were, during the pertinent tax years, occupied by sold lots. Interment rights have been exercised in most · of them. Fee simple title remains in the petitioner corporation when a lot is sold, and the purchaser acquires a perpetual easement for the sub-surface interment of human remains, together with an equitable right and interest in the care and maintenance of the surface and all of the surrounding landscaping, walks and drives. 14 Am. Jur. 2d "Cemeteries," Sec. 25. This situation creates a most unusual valuation problem. Although the cemetery corporation remains the owner of the twenty acres burdened by the above rights and easements, that area has no market value and is in fact a burden upon the remaining unsold land, which must produce future revenue to pay for the maintenance of the lots heretofore sold.

In · my view, the property, although unsubdivided of record, breaks down into four areas for valuation purposes:

1. Twenty acres, more or less, sold and occupied. This has a negative value as indicated above.

2. Seventeen acres, more or less, of land available for future lot sales. Some of this was platted for cemetery lots in the pertinent tax years (8,390 lots in 1973) but the remainder was open undeveloped acreage, although landscaped and maintained as a part of the cemetery.

3. A sixteen-room brick residence and office, occupied by the President of the petitioner corporation and in which the corporation's business is conducted. This stands on about three acres of the cemetery property separated from the rest by the main entrance drive. All witnesses are in agreement that it should be separately valued for tax purposes, since there would be an independent market for it and the cemetery could be operated from other quarters. It appears that 1.5 acres would be sufficient to constitute a residential site for this dwelling and that the remaining area could be devoted to cemetery purposes.

4. Other improvements: a storage shed, a vault structure and a building housing maintenance equipment. Although these are used in the production of an income stream for the cemetery, the witnesses substantially agreed that they should be given a separate valuation for tax purposes.

The case comes before the Court because of a single fundamental disagreement between the Petitioner and the County as to the proper valuation of the unsold land (category No. 2 above). The County contends that it would be suitable for a residential subdivision, and has gone so far as to prepare a plat showing it divided into 88 building lots. The cemetery predates Arlington's first zoning ordinance (1930) but was shown as "Residential A" on that first zoning map and has been zoned "R-6" since 1942. This zoning permits single family residential development on lots having a minimum area of 6,000 square feet and a minimum lot width of 60 feet. The classification also permits cemetery use subject to appropriate use permits which, in fact, the cemetery has always possessed. The County, through comparable sales of residential property, contends that this land would have sold for $1.00 per square foot in 1973, $1.20 per square foot in 1974 and $1.35 per square foot in 1975 and that it should be assessed at these levels for tax purposes since this would represent the highest and best use of the 17 undeveloped acres.

The Petitioner contends that the highest and best use of the 17 undeveloped acres is for continuing development as a cemetery. Petitioner employs no sales staff and does not promote or advertise in any way. Lot sales are usually made on an "at need" rather than a "pre need" basis. This has resulted over the years in a relatively stable level of sales at the rate of about 260 lots per year. All witnesses agree that the cemetery may expect continued sales at about this same level until all lots are sold, which would not occur for about 96 years unless sales are accelerated. The witnesses are also in agreement that the only correct way to value cemetery property is by capitalization of the stream of income realized from lot sales and the incidental sales and services mentioned above. The majority opinion in the appraisal profession seems to be that the expectation of such future return is so fixed and certain as to cemeteries that the income may be capitalized as an annuity, through the use of a coefficient derived from the "Inwood Tables." This results in a valuation less than half of that obtained by the County through its proposed residential development. In this connection, Petitioner points out that it has a legal, moral and ethical obligation to the owners of the sold cemetery lots, and to the next

of kin of those whose remains are interred therein, to maintain the entire tract as a cemetery and to continue the orderly development of the cemetery until it is entirely "sold out" in order that a perpetual care fund will be generated which will be sufficient to provide for permanent maintenance when no lots remain to be sold. Petitioner's President testified that representations have been made to the purchasers of lots at all times that it was the Petitioner's intention to operate the entire property only as a cemetery, that it would be fully landscaped and maintained for that purpose at all times, and that provisions had been made for perpetual care forty years before such trust funds became required by law. Petitioner argues that the creation of a residential subdivision in the midst of the cemetery would constitute a breach of trust with respect to these purchasers and would in all probability subject Petitioner to litigation. The County replies that the perpetual care fund could be bolstered by developing the 17 acres as a residential subdivision but sequestering ten percent of the proceeds of the residential lot sales for this purpose.

I have concluded that the Petitioner is right in this dispute. This property is contiguous, compact and unsubdivided. It has been entirely devoted to cemetery purposes since 1917 and the evidence contains not the slightest indication of any other proposed use for it. It is the only public cemetery in Arlington County and the demand for its burial space is stable, continuous and virtually assured. The County Government has repeatedly granted express permission to cemetery use, and indeed shows the property set apart for that use on its Master Land Use Map (Petitioner's Exhibit 17). Over 12,000 families have purchased cemetery lots in reliance upon representations that the property would be fully developed, landscaped and maintained for that use. They are in a position to enforce such representations, if breached, by a suit in equity. 14 Am. Jur. 2d "Cemeteries," Secs. 18, 19 and 20. Such rights have been reinforced, since 1964, by the effect of the perpetual care statutes providing for endowment trusts (Code Sec. 57-35.1, *et seq.*). These rights constitute a burden upon the unsold cemetery land which, in my judgment, has a profound effect upon its value. Apart from these considerations, there is merit to the owner's claim that they should not be compelled to commit a breach of faith with their purchasers, nor

to go out of business to gratify the County's demand for increased taxes, and that no rational system of taxation would require them to be taxed upon the assumption that they will do so.

Adopting the foregoing view of the case, the most convincing evidence appears to me to support the following valuations:

Categories 1 and 2 above, are treated together. All are lands owned by the Petitioner, but the burden of maintaining the sold lots in Category 1 detracts from the market value of the unsold property in Category 2. The income and expenses applicable to both categories from the continuing operations of the cemetery business are capitalized to produce a value of $342,100.00. The slight difference between the three tax years is negligible, and may be disregarded in round figures. Category 3, the house/office and 1.5 acres upon which it stands, are valued at $150,000.00 for 1973, $161,200.00 for 1974 and $172,400.00 for 1975. The improvements are appraised by the reproduction cost less depreciation approach, the land by comparable sales. Category 4, other improvements, are valued at $12,750.00 each year by the same method. The increasing annual depreciation is slight and may be disregarded in round figures. These figures lead to the following totals:

| 1973 | -- | $504,800.00 |
| 1974 | -- | $516,050.00 |
| 1975 | -- | $527,250.00 |

These totals must be broken down for tax purposes into separate valuations for land and improvements as follows:

| | *Land* | *Improvements* | *Total* |
|---|---|---|---|
| 1973 | $377,357.00 | $127,443.00 | $504,800.00 |
| 1974 | $380,629.00 | $135,421.00 | $516,050.00 |
| 1975 | $383,189.00 | $144,061.00 | $527,250.00 |

Counsel should prepare an appropriate Order pursuant to Code Sec. 58-1148, finding the assessments for 1973, 1974 and 1975 to be erroneous, correcting the same, converting to the applicable 40 percent assessment ratio, applying the applicable tax rates thereto, calculating the correct amount of real estate taxes and ordering the appropriate refunds to the Petitioner.